## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **DYLAN HENDRICKS,** | ) |
|     **Plaintiff,** | ) |
| | ) |
| **v.** | )    **CIVIL ACTION NO. 1:21-00526-CG-N** |
| | ) |
| **JOHN HAMM,** *Commissioner*, | ) |
| *Alabama Department of Corrections*, | ) |
|     **Defendant.** | ) |

## REPORT AND RECOMMENDATION

This civil action is before the Court on the motion to dismiss the amended complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) filed February 14, 2022, by the Defendant, John Hamm, Commissioner of the Alabama Department of Corrections (ADOC) (Doc. 11).[1] The assigned District Judge has referred said motion to the undersigned Magistrate Judge for appropriate action under 28 U.S.C. § 636(a)-(b), Federal Rule of Civil Procedure 72, and S.D. Ala. GenLR 72(a). *See* S.D. Ala. GenLR 72(b); (2/15/2022 electronic reference).

In accordance with the Court's briefing schedule (Doc. 12), the Plaintiff, Dylan Hendricks, timely filed a response (Doc. 13) in opposition to said motion, and the Commissioner timely filed a reply (Doc. 14) to the response. The motions is now under submission and is ripe for disposition. Upon due consideration, the undersigned finds that the motion is due to be **DENIED**.

---

[1] The undersigned will hereinafter refer to the Defendant as "the Commissioner."

## I.   *Legal Standards*

In deciding a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, in general "[t]he scope of the review must be limited to the four corners of the complaint." *St. George v. Pinellas Cty.*, 285 F.3d 1334, 1337 (11th Cir. 2002). The court must "accept the allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Duty Free Ams., Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1262 (11th Cir. 2015).

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' … [T]he pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (citations and some quotations omitted). *See also Duty Free*, 797 F.3d at 1262 (Courts " 'afford no presumption of truth to legal conclusions and recitations of the basic elements of a cause of action.' " (quoting *Franklin v. Curry*, 738 F.3d 1246, 1248 n. 1 (11th Cir. 2013) (per curiam))).

"To survive a motion to dismiss [for failure to state a claim], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim

>for relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662,
>678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v.*
>*Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).
>In other words, the complaint must contain "factual content that allows
>the court to draw the reasonable inference that the defendant is liable
>for the misconduct alleged." *Id.*

*Hi-Tech Pharm., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1196 (11th Cir. 2018).

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and quotation marks omitted). Put another way, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show [n]'—'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). "[T]o determine what the plaintiff must plausibly allege at the outset of a lawsuit, [courts] usually ask what the plaintiff must prove in the trial at its end." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, -- U.S. --, 140 S. Ct. 1009, 1014, 206 L. Ed. 2d 356 (2020).

Moreover, " 'the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.' " *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S at 678). *Iqbal* "suggested that courts considering motions to dismiss adopt a 'two-pronged approach' in applying these principles: 1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual

allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.' " *Id.* (quoting *Iqbal*, 556 U.S. at 679). "Importantly, … courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Id.* (quoting *Iqbal*, 556 U.S. at 679 (quoting *Twombly,* 550 U.S. at 567)).

> Attacks on subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) come in two forms. 'Facial attacks' on the complaint require the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion. 'Factual attacks,' on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.

*Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990) (per curiam) (citation and quotations omitted). Here, the Commissioner's Rule 12(b)(1) motion is a "facial attack," as it does not rely on matters outside of the complaint. Therefore, Hendricks is "afforded safeguards similar to those provided in opposing a Rule 12(b)(6) motion— the court must consider the allegations of the complaint to be true."  *Id.* at 1529.

Additionally, because this case involves "a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity[,]" the Court must independently "review[ the complaint], before docketing, if feasible or, in any event, as soon as practicable after docketing…" 28 U.S.C. § 1915A(a). On review, and independent of any motion to dismiss, the Court must "identify cognizable claims or dismiss the complaint, or any portion of the

complaint, if the complaint-- (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief."   *Id.* § 1915A(b). *See also Bingham v. Thomas*, 654 F.3d 1171, 1175 (11th Cir. 2011) (per curiam) (under § 1915A, a "district court may dismiss *sua sponte* a complaint…").[2]

## II.   *The Amended Complaint*

Per the amended complaint's well-pleaded allegations, Hendricks became incarcerated with ADOC on December 6, 2018, due to a parole violation. (Doc. 10 ¶ 7, PageID.28). Hendricks's parole board hearing was set for June 2020, though it was "continued … due to COVID" and has been reset for July 2022. (*Id.* ¶¶ 8, 16, PageID.29-30).

On August 30, 2019, Hendricks was transferred to ADOC's community based facility and community work center in Loxley, Alabama (hereinafter, "the Loxley Center").[3] (*Id.* ¶ 9, PageID.29). Hendricks worked outside the Loxley Center and "apparently" had no infractions other than a December 2019 verbal warning for lingering too long on a phone call. (*Id.*). Sharon Folks became warden of Loxley Center

---

[2] The assigned District Judge has also referred the amended to the undersigned Magistrate Judge for appropriate action under 28 U.S.C. § 636(a)-(b), Federal Rule of Civil Procedure 72, and S.D. Ala. GenLR 72(a). *See* S.D. Ala. GenLR 72(b); (1/31/2022 electronic reference). Under S.D. Ala. CivLR 72(a)(2)(R), the undersigned Magistrate Judge is authorized to "[p]rocess[] and review[] … civil suits filed by state prisoners under 42 U.S.C. § 1983[,]" and can "require responses, issue orders to show cause and any other orders necessary to develop a complete record, and … prepare a report and recommendation to the District Judge as to appropriate disposition of the … claim[.]"

[3] *See* http://www.doc.state.al.us/facility?loc=3 (last visited June 3, 2022)

on January 20, 2020. (*Id.* ¶ 10). Later that same month, Warden Folks met with Kylie Herring, Hendrick's fiancée; thereafter, Hendrick's prior verbal warning was changed into a "written discipline," and his phone and visit privileges were suspended. (*Id.* ¶ 11).

In August 2020, Herring went to the Loxley Center to donate an industrial-sized amount of sanitizer and personal protective equipment to help protect the inmates from the spread of COVID-19. (*Id.* ¶ 12). She was met by Loxley Center officers who advised her she must wait for Warden Folks to speak to her about whether or not she should leave her donation. (*Id.*). The sanitizer was dumped in the parking lot; Herring was advised that her donation could not be accepted and that the remainder could be taken to ADOC's administrative building in Montgomery. (*Id.* ¶ 12, PageID.29-30).

An ADOC Classification Summary for Hendricks was prepared on August 5, 2020, in which Warden Folks recommended Hendricks stay at the Loxley Center, noting that Hendricks "has one major infraction…but doesn't warrant removal." (*Id.* ¶ 13, PageID.30). Nevertheless, at the instigation of "unknown agents of ADOC…without cause[,]" Hendricks was transferred to G. K. Fountain Correctional Facility in Atmore[4] on August 28, 2020. (*Id.* ¶¶ 14, 17). The day before the transfer, Herring had emailed ADOC staff member Janet Lejune addressing her concerns for Hendricks's medical well-being, attaching corresponding medical records obtained

---

[4] *See* http://www.doc.state.al.us/facility?loc=17 (last visited June 3, 2022)

from ADOC. (*Id.* ¶ 18, PageID.31). Lejune responded by asking "where did you get these," after which their communication stopped. (*Id.*).

Shortly after arrival at Fountain Correctional, Hendricks was raped. (*Id.* ¶ 14, PageID.30). The rape was reported to ADOC staff, but Hendricks was never given a medical exam or testing, mental health evaluation, or legal follow-up. (*Id.* ¶ 14). Hendricks's mother once called ADOC's main office and was told something to the effect of "How do we know this is true? We will talk to the Warden of Fountain…" (*Id.*). However, no follow-up has since occurred. (*Id.*). On December 3, 2020, Hendricks was transferred from Fountain Correctional to Easterling Correctional Facility in Clio, where he advised the intake officer of the rape. (*Id.* ¶¶ 15, 22, PageID.30, 32). However, no one in ADOC investigated the assaults, conducted medical exams, offered a rape kit, offered mental help or counseling services, conducted STD screening, or took any actions against the assailants. (*Id.* ¶ 22, PageID.32). ADOC policy requires that alleged inmate victims be taken to a medical unit for medical evaluation and determine whether a sexual assault kit is needed. (*Id.* ¶ 23). ADOC regulations also require immediate attention to victims of rape. (*Id.* ¶ 23).

Hendricks's mother made many attempts to inquire as to the reasons for Hendricks's transfer from the Loxley Center to Fountain Correctional. (*Id.* ¶ 19, PageID.31). After many calls to Warden Folks, she was directed to Fountain Correctional and, after many more calls, spoke to the Director of Intake, who told her that Hendricks's transfer was due to "too many unannounced visits" by Herring,

though Herring's only unscheduled visit was the attempt to donate COVID-19 prevention supplies. (*Id.*). "ADOC agents" also advised Hendricks's mother and his parole advocate that the transfer was due to Herring's persistence in pursuing assistance for Hendricks. (Id. ¶ 21, PageID.31-32). Additionally, Lejune advised Herring that ADOC was irritated that Herring had been able to access Hendricks's medical records, even though ADOC had released them to Herring after submission of an approved release form. (*Id.* ¶ 20, PageID.31). Hendricks's family has since been hesitant to contact ADOC to avoid any repercussions to him. (*Id.* ¶ 21, PageID.32).

Based upon Hendricks's medical condition, including a diagnosis of chronic hepatitis and advanced liver problems, he would be eligible for a "medical furlough," in which affected ADOC inmates may be released from prison for medical conditions. (*Id.* ¶ 24, PageID.32). The medical furlough program would require that Hendricks be seen by a health doctor under contract with ADOC and then a doctor outside of the contractors' health program to approve. (*Id.*, PageID.32-33). These evaluations must first be approved by the warden of the ADOC facility where the inmate seeking medical furlough is housed. (*Id.*, PageID.33). Hendricks's warden has refused to do so. (*Id.*). Hendricks is currently at the GEO Group Facility in Columbiana; his classification has "apparently" never been reduced from Level I, and his parole date has been moved from June 2020 to July 2022. (*Id.* ¶¶ 15-16, 25, PageID.30, 33).

Based on the foregoing allegations, Hendricks asserts a cause of action under 42 U.S.C. § 1983 against the Commissioner in his official capacity for retaliation in violation of the First Amendment, claiming that his transfer from the Loxley Center,

the failure to take any action on his reported rape, the denial of a medical furlough, and the delay in his parole hearing were all unlawful acts of retaliation for exercising his First Amendment constitutional rights.[5]

### III.    *Analysis*

### a.    **Article III Standing**

The Commissioner first argues that Hendricks has failed to sufficiently allege that he has standing under Article III of the United States Constitution to bring his First Amendment retaliation claim. The undersigned disagrees.

"Although the Constitution does not fully explain what is meant by '[t]he judicial Power of the United States,' Art. III, § 1, it does specify that this power extends only to 'Cases' and 'Controversies,' Art. III, § 2." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016). "And ' "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."

---

[5] The amended complaint also asserts, in passing, violations of the Eighth Amendment. The Commissioner's motion argues that the amended complaint fails to plead any specific facts to support an Eighth Amendment cause of action under § 1983. Hendricks does not address this argument in his response or otherwise assert that he is in fact bringing an Eighth Amendment claim in his amended complaint. In light of this, the undersigned construes the amended complaint as not asserting an Eighth Amendment claim, and deems any passing reference to the Eighth Amendment therein to be a scrivener's error resulting from adapting the initial complaint (Doc. 1), which did expressly assert an Eighth Amendment § 1983 claim, into the present amended complaint in response to the Court's prior order dismissing the initial complaint with leave to file an amended complaint as to certain claims (Doc. 9). Further, the undersigned will recommend that references to the Eighth Amendment be stricken *sua sponte* from the amended complaint under Federal Rule of Civil Procedure 12(f) as immaterial.

' " *Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 818, 117 S. Ct. 2312, 138 L. Ed. 2d 849 (1997)). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Id.* at 338.

> To establish Article III standing, a prerequisite to invoking federal jurisdiction, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. [330], 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016). "When the defendant challenges standing via a motion to dismiss, 'both ... trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.' " *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 806 (11th Cir. 1993) (quoting *Warth v. Seldin*, 422 U.S. 490, 501, 95 S. Ct. 2197, 2206, 45 L. Ed. 2d 343 (1975)). But even at the pleading stage, "a plaintiff must 'clearly allege facts demonstrating each element,' and we evaluate standing on a motion to dismiss based on the facts alleged in the complaint." *Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1336 (11th Cir. 2019) (internal citation omitted) (quoting *Spokeo*, 136 S. Ct. at 1547).

*Tokyo Gwinnett, LLC v. Gwinnett Cty., Ga.*, 940 F.3d 1254, 1262 (11th Cir. 2019).

The Commissioner's opening brief challenges the second element of Article III standing, asserting that "nothing in the Amended Complaint shows how any of Hendricks' alleged injuries was caused by [the Commissioner]." (Doc. 11, PageID.41). While it is true that Hendricks has not alleged any facts indicating personal involvement by the Commissioner in the events underlying his claim, the Commissioner ignores the fact that Hendricks is suing him in his <u>official</u> capacity, which represents " 'only another way of pleading [the] action against [the] entity of which [the Commissioner] is an agent' "—i.e., ADOC. *Kentucky v. Graham*, 473 U.S.

159, 165, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985) (alterations added) (quoting *Monell v. New York City Dept. of Social Srvs.*, 436 U.S. 658, 690 n.55, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)). Here, Hendricks has alleged that he has been harmed by the actions of ADOC agents. Thus, his alleged injury is "fairly traceable to the challenged conduct of" ADOC, through its agents.[6]

In his reply, the Commissioner, for the first time, also challenges the redressability element.[7] The Commissioner complains that Hendricks's prayer for "[a]ppropriate declaratory and injunctive relief to remedy the unlawful conduct" (Doc. 10 ¶ 35(a), PageID.35), without more, "fails to establish that Hendricks' alleged injuries are redressable by the Commissioner" because "it is impossible to ascertain

---

[6] In his reply, the Commissioner argues that Hendricks cannot satisfy the "fairly traceable" element because "[t]here is no *respondeat superior* liability under § 1983." *Harris v. Ostrout*, 65 F.3d 912, 917 (11th Cir. 1995) (per curiam). First, that argument goes to the merits of Hendricks's § 1983 claim, not to whether he has standing to bring it. *See Culverhouse v. Paulson & Co. Inc.*, 813 F.3d 991, 994 (11th Cir. 2016) ("In reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." (quotation omitted)). Second, a defendant is only shielded from *respondeat superior* liability under § 1983 for individual capacity claims against him. *See Keith v. DeKalb Cnty., Ga.*, 749 F.3d 1034, 1047-48 (11th Cir. 2014). Here, the Commissioner is only being sued in his official capacity.

[7] Though raising an argument for the first time in a reply brief is generally impermissible, the undersigned will nevertheless address the Commissioner's argument against redressability because Article III standing implicates the Court's subject matter jurisdiction. *See, e.g.*, *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020) (en banc). The undersigned further finds that Hendricks has sufficiently alleged several "injuries in fact" to establish standing: that he was retaliatorily transferred from the Loxley Center, denied any action on his reported rape, denied a medical furlough, and delayed in receiving a parole hearing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S. Ct. 1138, 185 L. Ed. 2d 264 (2013) ("To establish Article III standing, an injury in fact must be concrete, particularized, and actual or imminent." (quotation omitted)).

whether Commissioner Hamm *could* provide the relief Hendricks seeks." (Doc. 14, PageID.76-77). However, Hendricks has alleged that the Commissioner, "among other things, … is responsible for management of the facilities of The Alabama Department of Corrections" and "has a statutory duty under Alabama law to attend to the needs of inmates in the prison." (Doc. 10 ¶ 5, PageID.28). Drawing all reasonable inferences in Hendricks's favor, as the Court must at this stage, the undersigned finds he has plausibly alleged that a favorable judicial decision against the Commissioner could provide some redress for at least some of his alleged injuries.[8]

To the extent the Commissioner suggests that Hendricks's prayer for relief must satisfy *Twombly/Iqbal* pleading standards, the undersigned disagrees. Unlike Federal Rule of Civil Procedure 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief[,]" Rule 8(a)(3) only requires

---

[8] With regard to Hendricks's claim that his parole hearing has been retaliatorily delayed, the Commissioner claims that he cannot provide any relief because he "has no say in the parole process, including determining if or when Hendricks is entitled to a parole hearing. That relief could only be afforded by individuals at the Alabama Board of Pardons and Paroles…" (Doc. 11 n.1, PageID.40. *See also* Doc. 14, PageID.76-77 (citing Ala. Code § 15-22-24(a)(1) ("The Board of Pardons and Paroles shall be charged with…[d]etermining which prisoners serving sentences in the jails and prisons of the State of Alabama may be released on parole and when and under what conditions."))). Even accepting this as true, that does not deprive Hendricks of standing, since the Commissioner has not argued, nor is it readily apparent, he is unable to provide redress for any of Hendricks's other alleged injuries, and "Article III … does not demand that the redress sought by a plaintiff be complete." *Moody v. Holman*, 887 F.3d 1281, 1287 (11th Cir. 2018). *See also I.L. v. Alabama*, 739 F.3d 1273, 1282 (11th Cir. 2014) (Relief that "would likely redress (at least in part) the plaintiffs' injury … is enough for standing purposes. *See Made in the USA Foundation v. United States*, 242 F.3d 1300, 1310–11 (11th Cir. 2001) (relief which remedies at least some of the alleged injuries is sufficient to establish redressability).").

"a demand for the relief sought," which "is not arduous—any concise statement identifying the remedies and the parties against whom relief is sought will be sufficient." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1161 (11th Cir. 1993) (quotation omitted) (analyzing prior version of Rule 8(a)(3) which stated that a complaint must contain "a demand for judgment for the relief the pleader seeks"). Hendricks's demand for relief satisfies this standard.

### b.    § 1983 Retaliation

" 'A constitutional claim brought pursuant to § 1983 must begin with the identification of a specific constitutional right that has allegedly been infringed.' " *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1288 (11th Cir. 2019) (quoting *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019)). The amended complaint alleges that Hendricks was punished by ADOC employees "in retaliation for exercising his right to free speech, or … due to his association with another person who has exercised their rights to free speech." (Doc. 10 ¶ 33, PageID.34-35).

The First Amendment to the United States Constitution provides that "Congress shall make no law ... abridging the freedom of speech…" U.S. Const. amend. I. "The Amendment protects 'not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right.' " *DeMartini*, 942 F.3d at 1288 (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000)). This right to be free from retaliation extends to prisoners. *See Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003) ("The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free

speech." (citing *Thomas v. Evans*, 880 F.2d 1235, 1242 (11th Cir. 1989)); *Adams v. James*, 784 F.2d 1077, 1082 (11th Cir. 1986) ("[P]rison officials may not retaliate against an inmate for exercising a constitutionally protected right."). " 'To state a [F]irst [A]mendment claim for retaliation, a prisoner need not allege violation of a separate and distinct constitutional right.' Rather, '[t]he gist of a retaliation claim is that a prisoner is penalized for exercising the right of free speech.' " *Farrow*, 320 F.3d at 1248 (quoting *Thomas*, 880 F.2d at 1242). *Accord O'Bryant v. Finch*, 637 F.3d 1207, 1212 (11th Cir. 2011) (per curiam).

However, a prisoner's free speech rights are not equal to those of non-prisoners. It is a "familiar proposition that lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system. In the First Amendment context a corollary of this principle is that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974) (citations and quotation omitted). *Accord, e.g.*, *Smith v. Mosley*, 532 F.3d 1270, 1277 (11th Cir. 2008). For instance, "an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement[, and] may maintain a cause of action against prison administrators who retaliate against him for making such complaints." *Mosley*, 532 F.3d at 1276. *See also Farrow*, 320 F.3d at 1248 ("A prisoner can establish retaliation by demonstrating that the

prison official's actions were 'the result of his having filed a grievance concerning the conditions of his imprisonment.' " (quoting *Wildberger v. Bracknell*, 869 F.2d 1467, 1468 (11th Cir.1989) (per curiam))).

Additionally, the United States Supreme Court has "understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984). *See also O'Laughlin v. Palm Beach Cty.*, 30 F.4th 1045, 1053 (11th Cir. 2022) ("Although both parties refer in their briefs to the First Amendment's 'Free Association Clause,' the Constitution does not by its terms protect the freedom of association. Rather, association has been characterized as a right 'implicit' in the First Amendment."). "According to Supreme Court precedent, the United States Constitution accords special protection to two different forms of association, 'intimate association' and 'expressive association.' " *McCabe v. Sharrett*, 12 F.3d 1558, 1562–63 (11th Cir. 1994) (citing *Roberts*, 468 U.S. at 617-18, and *City of Dallas v. Stanglin*, 490 U.S. 19, 23–25, 109 S. Ct. 1591, 104 L. Ed. 2d 18 (1989)). "[T]he right of intimate association"—the only right of association Hendricks invokes here—is "the freedom to choose to enter into and maintain certain intimate human relationships[ and ]is protected from undue governmental intrusion as a fundamental aspect of personal liberty." *Id.* at 1563 (citing *Roberts*, 468 U.S. at 617-20). The right to freedom of association also includes the right to be free from retaliation by a public official for exercising it. *See, e.g.*, *Cook v. Gwinnett Cty. Sch. Dist.*, 414 F.3d 1313,

1320 (11th Cir. 2005) ("[T]he law is clearly established that public employees have a First Amendment right to engage in associative activity without retaliation.").

"To state a [§ 1983] retaliation claim, the commonly accepted formulation requires that a plaintiff must establish first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech [or act]; and third, that there is a causal connection between the retaliatory actions and the adverse effect on [the protected] speech [or act]." *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).[9] *Accord Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc) ("A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.").[10] "This formulation describes retaliation claims in general, but it will yield variations in different contexts … [E]ach step of the analysis is flexible enough to take into account the various contexts in which retaliation claims might be made." *Thaddeus-X*, 175 F.3d at 394–95.

---

[9] Though *Bennett* did not involve retaliation against a prisoner, the Eleventh Circuit has applied *Bennett*'s statement of the elements of a § 1983 retaliation claim to those brought by prisoners. *See Mosley*, 532 F.3d at 1276 & n.16; *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011).

[10] *Bennett* relied on *Thaddeux-X*, among other cases, in stating the elements of a retaliation claim. *See Mosley*, 532 F.3d at 1276 n.16.

The Commissioner challenges the first element, arguing that Hendricks "does not allege that *he* engaged in any speech here, let alone protected speech. His only allegations concern the speech of others, namely, his fiancée and mother." (Doc. 11, PageID.42). Hendricks does not contest this characterization of his amended complaint in his response, instead making clear that the protected activity he is relying on are the "many inquiries and complaints" his "family…made…on his behalf…." (Doc. 13 ¶ 11, PageID.54). Hendricks presents two grounds for why "[a] party suffers retaliatory conduct in violation of his First Amendment rights when a third party has spoken on his behalf." (*Id.* ¶ 16, PageID.56). First, he argues that "the First Amendment is implicated when authorities attempt to interfere with intimate association with a family member." (Doc. 13 ¶ 16, PageID.56). Second, asserting that "a victim's speech is no less protected if it is communicated through another's lips than from the victim himself" (*id.*), he invokes the doctrine of "third-party standing, [which] in rare circumstances allows a party to premise its claim for relief on the constitutional rights of another party." *Fla. Right to Life, Inc. v. Lamar*, 273 F.3d 1318, 1322–23 (11th Cir. 2001) (citing *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 629, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991)).

### 1. Third-Party Standing

"A party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.' " *Kowalski v. Tesmer*, 543 U.S. 125, 129, 125 S. Ct. 564, 160 L. Ed. 2d 519 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 499, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)). The Supreme Court

has "not treated this rule as absolute, however, recognizing that there may be circumstances where it is necessary to grant a third party standing to assert the rights of another." *Id.* at 129–30. Under the third-party-standing doctrine, "a litigant may raise a claim on behalf of a third party if the litigant can demonstrate that he or she has suffered a concrete, redressable injury, that he or she has a close relation with the third party, and that there exists some hindrance to the third party's ability to protect his or her own interests." *Edmonson*, 500 U.S. at 629.[11] The Supreme Court has generally "not looked favorably upon third-party standing." *Kowalski*, 543 U.S. at 130. Nevertheless, "[t]hese prudential principles 'are not constitutionally mandated, but rather stem from a salutary "rule of self-restraint" designed to minimize unwarranted intervention into controversies where the applicable questions are ill defined and speculative.' " *Young Apartments, Inc. v. Town of Jupiter, FL*, 529 F.3d 1027, 1041 (11th Cir. 2008) (quoting *Craig v. Boren*, 429 U.S. 190, 193, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976)).

While Hendricks's fanciful musings about speaking through another's lips, and others' speech becoming his own, serve largely to obscure rather than clarify the issue,

---

[11] A litigant bringing a § 1983 retaliation claim who shows entitlement to third-party standing can base such a claim on the "protected activity" of that third-party. *See Camacho v. Brandon*, 317 F.3d 153, 160 (2d Cir. 2003) ("Camacho[, who was found entitled to 'third-party standing to assert whatever First Amendment claims Fuentes may have[,]'] is not claiming that he was fired from his position as a public employee in retaliation for exercising his own First Amendment freedoms. Nor is he claiming that he was fired because of his affiliation or association with a particular political party. Rather, he claims that he was fired in retaliation for Fuentes' activities. Thus, his claim must succeed or fail based on whether Fuentes' activities enjoyed the protection of the First Amendment.").

his response brief, particularly in its citation to *Kowalski* and *Powers,* sufficiently puts the Commissioner on notice that he is invoking third-party standing to bring claims based on his mother's and fiancée's speech. The Commissioner fails to acknowledge, let alone substantively address, Hendricks's third-party standing argument, and the undersigned cannot say that his invocation of that doctrine is "frivolous" or "fails to state a claim upon which relief may be granted" on the face of the amended complaint, such that the Court could dismiss any third-party-standing claims *sua sponte* under § 1915A(b)(1). Moreover, as will be explained, Hendricks has sufficiently alleged a § 1983 retaliation claim based on his own protected activity. Accordingly, the undersigned determines that Hendricks should not be foreclosed from pursuing third-party standing at this stage of the case.

## 2.  Intimate Association

Because Hendricks is claiming he was retaliated against for the speech or actions of a third party, his relevant "protected activity" is association, not speech. Though, again, Hendricks's musings about another's speech becoming his own have unfortunately obscured this point, that conclusion is supported by the two Sixth Circuit Court of Appeals opinions on which he primarily relies, *Adkins v. Board of Education*, 982 F.2d 952, 956 (6th Cir. 1993), and *Sowards v. Loudon County., Tenn.*, 203 F.3d 426 (6th Cir. 2000). In both of those cases, the plaintiffs based their claims for § 1983 retaliation on "the protected action…of familial/intimate association," and not of speech:

> In *Adkins*…, 982 F.2d 952, 953…, the plaintiff claimed that her employment was terminated due to the actions of her husband. More specifically, she argued that the defendants violated her First Amendment right of association and that she was dismissed "for affiliation and association with her husband and others with whom she had a right to associate." *Id.* [That is,] she claimed an injury based on her own protected actions—the right to associate with whom she chose—not the protected actions of a third party. In *Sowards*…, 203 F.3d 426, 430…, the plaintiff worked for the sheriff's department and claimed that she was retaliated against because her husband was running against the current sheriff. She sued, arguing that she was terminated in retaliation for the exercise of *her* First Amendment rights of political and intimate association. *Id.*

*Moody v. Mich. Gaming Control Bd.,* 847 F.3d 399, 403 (6th Cir. 2017). *See also Lifter v. Cleveland State Univ.*, 707 F. App'x 355, 365 (6th Cir. 2017) (unpublished) ("In order for Lifter to bring a First Amendment claim arising from her termination, she could have asserted that the termination violated her First Amendment right to association. *See Sowards v. Loudon Cty.*, 203 F.3d 426, 433 (6th Cir. 2000) (a spouse who alleged that she was fired as a result of her husband's political speech allowed to bring retaliation claim alleging her own First Amendment right to association). At oral argument, Lifter repeatedly stated that she was only asserting her claim through Gelman's First Amendment speech and conceded that 'there was no protected activity by Lifter.' ").[12]

---

[12] "At a minimum, the right of intimate association encompasses the personal relationships that attend the creation and sustenance of a family—marriage, childbirth, the raising and education of children, and cohabitation with one's relatives." *McCabe*, 12 F.3d at 1563 (citing *Roberts*, 468 U.S. at 619). "Whether the right extends to other relationships depends on the extent to which those attachments share the qualities distinctive to family relationships, such as 'relative smallness' and 'seclusion from others

However, because "[t]he very object of imprisonment is confinement[,] freedom of association is among the rights least compatible with incarceration." *Overton v. Bazzetta*, 539 U.S. 126, 131, 123 S. Ct. 2162, 156 L. Ed. 2d 162 (2003). Thus, as the Commissioner correctly points out, "[s]ome curtailment of that freedom must be expected in the prison context." *Id. See also Jones v. N.C. Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 125-26, 97 S. Ct. 2532, 53 L. Ed. 2d 629 (1977) ("Perhaps the most obvious of the First Amendment rights that are necessarily curtailed by confinement are those associational rights that the First Amendment protects outside of prison walls. The concept of incarceration itself entails a restriction on the freedom of inmates to associate with those outside of the penal institution. Equally as obvious, the inmate's 'status as a prisoner' and the operational realities of a prison dictate restrictions on the associational rights among inmates."); *Adams*, 784 F.2d at 1081 ("Legitimate policies and goals of the correction system may justify restrictions limiting prisoners' associational rights." (citing *Pell*, 417 U.S. at 821)); *Hollins v. Samuals*, 540 F. App'x 937, 938-39 (11th Cir. 2013) (per curiam) (unpublished) ("as a prisoner, Hollins has a limited right to freedom of association" (citing *Overton*, 539 U.S. at 131)) (rejecting assertion that prisoner's transferring money to a Filipina national was protected conduct supporting a First Amendment retaliation claim, explaining that such "conduct is too far removed from the type of communicative

---

in critical aspects of the relationship.' " *Id.* (citing *Roberts*, 468 U.S. at 620). The Commissioner has not argued that Hendricks's relationship with either his mother or his fiancée is outside the scope of the right of intimate association, and the undersigned declines to definitively rule on the issue at this stage of the case.

conduct—primarily literal speech—that courts have recognized as protected under the First Amendment in the prison setting"). Nevertheless, it is not the case that "any right to intimate association is altogether terminated by incarceration or is always irrelevant to claims made by prisoners[,]" *Overton*, 539 U.S. at 131, and the Commissioner' briefing makes little effort to explain how the specific alleged retaliatory actions taken against Hendricks for the actions of his fiancée and mother were actually justified by a legitimate policy or goal of the correction system. After all, if a prisoner clearly has a "First Amendment right [to] complain[] to … prison[] administrators about the conditions of his confinement[,]" and to be free from retaliation for doing so, *Mosley*, 532 F.3d at 1276, it is difficult to see why he would not have, to at least some degree, a similar right to be free from retaliation for association with individuals who make similar complaints on his behalf.

Pointing to Hendricks's allegation that his mother was told by an ADOC official that "her son's transfer was due to 'too many unannounced visits' by" Hendricks's fiancée (Doc. 10 ¶ 19, PageID.31), the Commissioner argues that the amended complaint reveals on its face that there was a legitimate corrections goal behind Hendricks's transfer, that an "unannounced visit to a prison is not protected speech[,]" and that "repeated unannounced visits to any correctional facility would instead reasonably be construed as a security concern…" (Doc. 11, PageID.43). This argument is flawed for several reasons. First, a freedom-of-association retaliation claim does not appear to hinge on whether the actions of the non-party are protected activities. Rather, the plaintiff's associate with that non-party is itself the protected activity.

Second, accepting the above-quoted allegation as true does not require the Court to accept the truth or validity of the ADOC official's statement, only that the statement was in fact made. Indeed, the amended complaint disputes the assertion that Hendricks's fiancée made repeated unannounced visits, alleging that her only unscheduled visit was the one where she attempted to donate COVID-prevention supplies. (Doc. 10 ¶ 19, PageID.31). Third, even assuming that Hendricks's fiancée actually did engage in unannounced visits, determining whether they could reasonably have been construed as a security concern, and whether Hendricks's transfer was a response justified by a legitimate policy or goal of ADOC, are not issues that can be resolved at the Rule 12(b)(6) stage. Viewed in the light most favorable to Hendricks, the amended complaint contains enough well-pleaded allegations plausibly calling either proposition into question. Finally, this argument fails to account for the other retaliatory actions that Hendricks alleges were taken against him.

The Commissioner also argues that Hendricks's "movement between different facilities does not amount to a cognizable injury" to support his retaliation claim because he "has no constitutional right to be confined in any particular prison." (Doc. 11, PageID.42-43). The Commissioner is wrong. "[I]n *Bridges v. Russell*, 757 F.2d 1155 (11th Cir. 1985), [the Eleventh Circuit Court of Appeals] held that a prisoner stated a claim of retaliation based on the prisoner being transferred to another facility even though prisoners do not have a liberty interest in remaining at a particular facility" since, as was previously noted, "[t]he gist of a retaliation claim is that a

prisoner is penalized for exercising [a protected] right[, and t]he penalty need not rise to the level of a separate constitutional violation." *Thomas*, 880 F.2d at 1242.

Finally, in his reply, the Commissioner raises a challenge as to the "causation" element of retaliation, claiming that the amended complaint fails to allege sufficient facts showing temporal proximity between the protected activity and the retaliatory actions.[13] These arguments are unpersuasive, largely consisting of assertions that Hendricks should have included more detailed factual allegations to establish "a clear timeline for the alleged retaliatory actions…" (Doc. 14, PageID.78). However, a plaintiff is only required to plead enough factual allegations to plausibly suggest a claim, and Hendricks's allegations, when construed in the light most favorable to him, plausibly suggest sufficient temporal proximity between the complaints of his mother and fiancée and the alleged retaliatory acts.[14]

---

[13] Though the Commissioner did not challenge causation in his opening brief, Hendricks arguably opened the door to the challenge by arguing causation in his response.

[14]     The undersigned also finds no independent grounds to conclude that the amended complaint should be dismissed *sua sponte* under 28 U.S.C. § 1915A(b)(1) for being "frivolous, malicious, or fail[ing] to state a claim upon which relief may be granted…"
    The Court dismissed Hendricks's initial complaint, with leave to file an amended complaint as to certain claims, after finding that Hendricks's claims for monetary and equitable relief against the Commissioner in his official capacity were barred by Eleventh Amendment immunity, and that the initial complaint failed to show entitlement to the exception to Eleventh Amendment immunity allowing claims for prospective declaratory and/or injunctive relief to proceed. (*See* Docs. 7, 9). Specifically, Hendricks was granted leave "to file and serve an amended complaint that plausibly alleges a claim or claims for prospective declaratory and injunctive relief under 42 U.S.C. § 1983 against the Defendant Commissioner for the Alabama Department of Corrections[,]" consistent with *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908). (Doc. 9, PageID.25-26; Doc. 7, PageID.20, 23; Doc. 9).
    The amended complaint demands only declaratory and injunctive relief, and the

### IV. *Conclusion & Recommendation*

In accordance with the foregoing analysis, and pursuant to 28 U.S.C. § 636(b)(1), Federal Rule of Civil Procedure 72(b)(1), and S.D. Ala. GenLR 72(a)(2)(R) & (S), the undersigned **RECOMMENDS** that the Commissioner's motion to dismiss the amended complaint under Rules 12(b)(1) and 12(b)(6) (Doc. 11) be **DENIED**, and that references to the Eighth Amendment be **STRICKEN** *sua sponte* from the amended complaint (Doc. 10) under Federal Rule of Civil Procedure 12(f) as immaterial.

### <u>NOTICE OF RIGHT TO FILE OBJECTIONS</u>

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within 14 days of the date of service of this document, file specific written

---

Commissioner has not argued for dismissal based on Eleventh Amendment immunity, or claimed that the amended complaint does not comply with the Court's prior grant of leave to amend. A court is under no general obligation to address Eleventh Amendment immunity *sua sponte*, *see McClendon v. Ga. Dep't of Cmty. Health*, 261 F.3d 1252, 1257 (11th Cir. 2001) ("[T]he jurisdictional bar embodied in the Eleventh Amendment is a rather peculiar kind of jurisdictional issue. Unlike most subject matter jurisdiction issues, which cannot be waived by the parties and must be raised by a court on its own initiative, the Eleventh Amendment does not automatically deprive a court of original jurisdiction. Rather, … the Eleventh Amendment grants the State a legal power to assert a sovereign immunity defense should it choose to do so. This understanding of the Eleventh Amendment as a volitional defense is manifest in decisions allowing it to be waived by the state, or ignored by the court if not raised. Thus, unlike other jurisdictional bars, federal courts are required to consider whether the Eleventh Amendment strips them of jurisdiction only if the state defendant insists that it does." (citations and quotations omitted)), and § 1915A(b)(2) only requires dismissal of a prisoner's complaint when it "seeks <u>monetary</u> relief from a defendant who is immune from such relief" (emphasis added). In light of this, the undersigned declines to determine *sua sponte* whether the amended complaint is barred by Eleventh Amendment immunity.

objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the 6th day of June 2022.

*/s/ Katherine P. Nelson*
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**